UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


ANTHONY DEONTA FINCH,

        Petitioner,

v.                                                     Case No. 3:22-cv-1387-JEP-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

        Respondent.
_____

## **ORDER**

Finch filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging his state court conviction for second-degree murder. (Doc. 1). After reviewing the petition, the response (Doc. 8), the reply (Doc. 10), and the relevant state court record (Doc. 9), the petition is due to be denied.

## I.    PROCEDURAL HISTORY

A jury found Finch guilty of second-degree murder, and the trial judge sentenced Finch to life in prison. (Doc. 9-1 at 460–66). Finch appealed, and the state appellate court affirmed in a written opinion. (Doc. 9-6).

Finch filed a motion for post-conviction relief under Rule 3.850, Florida Rules of Criminal Procedure (Doc. 9-9), the post-conviction court denied relief without an evidentiary hearing (Doc. 9-10), and the state appellate court

dismissed the appeal in a decision without a written opinion. (Doc. 9-13). Finch's § 2254 petition followed.

The evidence at trial proved that, after losing money and a gun during a game of dice, Finch angrily shot and killed Kenard Hendley, who had won. Hendley's friend testified that he watched Finch and Hendley gambling with dice inside an apartment in the kitchen. (Doc. 9-2 at 290–91, 293). Hendley's friend observed Hendley win money and Finch lose money. (Doc. 9-2 at 292). Hendley's friend exited the back door of the apartment to speak on the telephone and heard a gunshot about a minute later. (Doc. 9-2 at 293–94). Hendley's friend called 911 after he saw Hendley on the ground and saw that Finch had left the apartment. (Doc. 9-2 at 295–96, 302–09).

Another friend testified that he watched Finch and Hendley gambling with the dice. (Doc. 9-2 at 339). He observed Hendley win a lot of money and Finch become upset because he lost a lot of money. (Doc. 9-2 at 340). He testified that, after losing all his money, Finch bet a revolver, and Hendley rolled the dice and won. (Doc. 9-2 at 341). He testified that Hendley picked up all the money and started to leave out the back door and that Finch shot Hendley in the back. (Doc. 9-2 at 343–44). He did not observe Finch pull the trigger of the gun but observed Finch holding the firearm. (Doc. 9-2 at 344). He

2

testified that Hendley fell to the ground and started bleeding. (Doc. 9-2 at 344–47).

Finch's girlfriend lived in the apartment where the shooting occurred. (Doc. 9-2 at 332–33, 338). The sister of Finch's girlfriend, who lived next door, testified that, after the shooting, Hendley's friends came over and told her that Finch shot Hendley. (9-2 at 399–402).

A detective who searched the apartment where the shooting occurred observed red dice on the floor in the living room, white dice on the floor in the kitchen, and a door in the kitchen that exited to a backyard. (Doc. 9-2 at 443–45). A motion-activated surveillance camera outside the front door of the apartment where the shooting occurred did not record Finch exiting the front door after the shooting. (Doc. 9-2 at 506–07). The camera recorded Hendley's friends dragging Hendley out the front door. (Doc. 9-2 at 507). A medical examiner identified a gunshot wound on Hendley's back and opined that the gunshot wound caused Hendley's death. (Doc. 9-2 at 517–18, 521–22).

After his arrest, Finch sent a letter to his girlfriend that stated, "Make sure that they don't do depositions." (Doc. 9-2 at 437–38, 651). During a telephone call in jail, Finch asked his girlfriend to dissuade witnesses from testifying against him and asked her to refuse to testify as well. (*See* Doc. 9-2 at 592–623). A detective searched the home of one of Hendley's friends who

was present during the shooting and discovered in his bedroom "two spent shell casings," a "0.32 caliber" handgun, "one 0.38 caliber Special live round of ammunition," and "one live round of nine-millimeter ammunition." (Doc. 9-2 at 654–55). A firearms examiner testified that the bullet removed from Hendley's body was a 0.38 caliber bullet ordinarily fired in either a 0.38 caliber handgun or a 0.357 Magnum handgun. (Doc. 9-2 at 668).

A detective arranged for a confidential informant to share a cell in jail with Finch. (Doc. 9-2 at 468–69, 680). Before trial, the informant had pleaded guilty to three attempted murders, two home invasion robberies, two armed robberies, and possession of a firearm by a felon, and faced thirty years in prison at sentencing. (Doc. 9-2 at 673–74). The informant had worked with the prosecutor's office on fifteen cases but denied that the prosecutor's office had promised anything for his testimony in Finch's case. (Doc. 9-2 at 675–76).

During a recorded conversation, Finch told the informant that he had lost a gun playing dice and that he "[doesn't] lose guns." (Doc. 9-2 at 688–90). Finch said that, when the person who won tried to pick up the gun, he refused to allow the person to leave with the gun. (Doc. 9-2 at 692). He said that he did not plan on shooting the person who won, but when the person appeared to "kind of [come] towards [him]" and started "making his way toward" the gun, he shot the person once. (Doc. 9-2 at 689–93). He said that he planned to shoot

a second time, but his friend shoved him hard to make him realize what he had done. (Doc. 9-2 at 694–95). He said that he told his girlfriend that he shot the person who won because the person had stolen money that belonged to her. (Doc. 9-2 at 699). He said that his girlfriend had learned that he—Finch—stole the money from her bedroom, that he became angry when he lost the stolen money playing dice, and that he started shooting after he lost. (Doc. 9-2 at 699–700).

During the defense's case, an officer testified that he was the first officer to arrive at the scene of the shooting. (Doc. 9-2 at 741). He testified that he observed a male lying on his back and a group of persons trying to render aid. (Doc. 9-2 at 741–42). He testified that the male told him that he suffered a gunshot wound to his back. (Doc. 9-2 at 742). He testified that, when he asked the male to identify the shooter, the male did not respond. (Doc. 9-2 at 742). He testified that the persons rendering aid also did not identify the shooter or provide any relevant information. (Doc. 9-2 at 742–43).

## II.   LEGAL STANDARD

### A.   AEDPA

Pursuant to the Antiterrorism Effective Death Penalty Act, a federal court may not grant federal habeas relief with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

"[S]ection 2254(d)(1) provides two separate bases for reviewing state court decisions; the 'contrary to' and 'unreasonable application' clauses articulate independent considerations a federal court must consider." *Maharaj v. Sec'y for Dep't of Corrs.*, 432 F.3d 1292, 1308 (11th Cir. 2005). *Williams*, 529 U.S. at 412–13, explains the meaning of each clause:

> Under the "contrary to" clause, a federal court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.

"[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).[1]

Finally, under § 2254(d)(2), a federal court may grant a writ of habeas corpus if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). However, the state court's "determination of a factual issue . . . shall be presumed correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination." *Wood*, 558 U.S. at 301 (citation omitted).

---

[1] In considering the "unreasonable application inquiry," the Court must determine "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Review is limited to the record before the state court. *Cullen v. Pinholster*, 563 U.S. 170, 180–81 (2011).

7

**B.      Exhaustion and Procedural Default**

Before seeking habeas relief in federal court, a state prisoner must exhaust all state court remedies that are available for challenging his conviction. *See* 28 U.S.C. § 2254(b)(1)(A). To do so, he must "fairly present[ ]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust their claims, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), thereby alerting the appropriate state court of "the federal nature of the claim[s]," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). *See also Pope v. Rich*, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that *Boerckel* applies to the state collateral review process as well as the direct appeal process.").

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. Under the doctrine of procedural default:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 747–48 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 84–85 (1977). A state court's

8

> invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. *See, e.g.*, *Walker v. Martin*, 562 U.S. 307, 316 (2011); *Beard v. Kindler*, 558 U.S. 53, 60–61 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. *See Coleman*, 501 U.S. at 750.

*Martinez v. Ryan*, 566 U.S. 1, 9–10 (2012) (internal citations modified).

"To show cause, the petitioner must demonstrate 'some objective factor external to the defense' that impeded his effort to raise the claim properly in state court." *Ward v. Hall*, 592 F.3d 1144, 1157 (11th Cir. 2010) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Once cause is established, "the petitioner also must show actual prejudice from the alleged constitutional violation." *Id.* (citing *Sykes*, 433 U.S. at 84). "[I]n order to show prejudice, a petitioner must demonstrate that 'the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness.'" *Id.* (quoting *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992)).

In the absence of a showing of cause and prejudice, a petitioner may still receive consideration on the merits of a procedurally defaulted claim if he can show that a fundamental miscarriage of justice would occur:

> "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier*, 477 U.S. at 496. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001).

*Ward*, 592 F.3d at 1157 (internal citations modified).

"To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." *Johnson*, 256 F.3d at 1171 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Schlup*, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. *Schlup*, 513 U.S. at 324.

## III.   DISCUSSION

### A.   Ground One

Finch asserts that the trial judge violated his federal rights by denying his motion to suppress his statements recorded by the informant in jail. (Doc. 1 at 5–12).

The trial judge denied the motion to suppress as follows (Doc. 9-1 at 173–76) (state court record citations omitted):

> This cause came before the court on Defendant's Motion to Suppress Statements, Admissions, and Confessions filed on or about April 4, 2018. The court held a hearing regarding the aforementioned motion on August 23, 2018, and heard argument of counsel, reviewed the videotaped interview of the Defendant, as well as the deposition of Desmaine Grier. The Court being otherwise fully advised in the premises, finds as follows:
>
> The Defendant argues that his confession was obtained in violation of his Fifth Amendment Right to Remain Silent, as he invoked his right to remain silent at least seven times during his interview with the Jacksonville Sheriff's Office.
>
> The statements sought to be suppressed, however, are statements recorded by Mr. Desmaine Grier, an inmate in the Duval County Jail who temporarily shared a cell with the Defendant, Anthony Finch.
>
> The Defendant was arrested on July 18, 2017, pursuant to an arrest warrant for the murder of Kenard Hendley. Immediately after his arrest he was advised of his rights and interrogated by detectives.
>
> At a point the interrogation stopped and resumed with a different detective wanting to question the Defendant about a separate murder of a gentleman known as "Tiny Man." That detective read the Defendant his *Miranda* Rights again and asked him questions about the "Tiny Man" matter.
>
> At various times during that interview, the Defendant says things such as "I am just saying please take me to jail, please." "I want to go. Please. I want to lay

11

down, bro." "Man, I just want to lay down, please." "Can I please go? I'm tired of being here, man. I just want to lay down, man. I've been here for too long." At a point, the interview ended without the Defendant admitting guilt. Before the Defendant was escorted to the Duval County Detention Facility, Jacksonville Sheriff's Office detectives arranged to have Mr. Finch placed in the same cell as inmate Desmaine Grier. They provided Mr. Grier with a recording device to record any conversation with Defendant, Anthony Finch.

Mr. Grier describes his encounter with the Defendant in his deposition dated January 16, 2018. . . . During the conversation between Grier and Finch, the Defendant allegedly confessed to the murder.

The defense relies primarily on the case of *Deviney v. State*, 112 So. 3d 57 (Fla. 2013), for the proposition that the Defendant's statements during the interview with detectives were an unambiguous invocation of his right to remain silent.

The State points to the case of *Ford v. State*, 801 So. 2d 318 (Fla. 1st DCA 2001), for the proposition that the Defendant's repeated statement during interrogation "Just take me to jail" was not an unambiguous invocation of his right to remain silent; and thus, the interrogating officer was under no obligation to cease questioning or to clarify whether the Defendant wanted the interrogation to cease.

A review of the interrogation itself reveals that the Defendant was quite talkative and that on the heels of making the aforementioned statements, he continued to converse with the detectives.

A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer under the circumstances would

12

understand the statement to be an assertion of the right to remain silent. If the statement is ambiguous or equivocal, then the police have no duty to clarify the defendant's intent, and they may proceed with interrogation. *State v. Owens*, 696 So. 2d 715, 718 (Fla. 1997); *Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994).

The State in their argument first contended that the Defendant did not unequivocally invoke his right to remain silent, but that even if the Defendant's statements were considered to be an invocation, the Defendant reinitiated conversation with the detectives and did not demonstrate that he wanted the interrogation to cease.

The State also points out that the statements about wanting to be taken to jail were primarily given to the detective who was discussing the "Tiny Man" case and not with the detective who was investigating the case for which the Defendant was under arrest. So, the State in essence argued that if the Defendant's conduct was considered an invocation, it only related to the "Tiny Man" case as opposed to the case at hand.

The State went on to argue that even if there was an invocation that encompassed the present case, *Miranda* does not apply in a jailhouse informant situation. Conversations between incarcerated suspects and undercover agents posing as fellow inmates do not necessarily implicate the concerns underlying *Miranda. Illinois v. Perkins*, 496 U.S. 292 (1990).

A defendant does not make out a violation of the Sixth Amendment right to counsel simply by showing that the informant, either through prior arrangement or voluntarily, reported the defendant's incriminating statements to police. *United States v. Birbal*, 113 F.3d 342 (2d Cir. 1997). Ploys to mislead a suspect, or lull

13

him into a false sense of security that do not rise to the level of compulsion or coercion to speak, are not within *Miranda*'s concerns.

A defendant's videotaped conversation with a "false friend" recruited by police to visit the defendant in jail, which took place before the defendant was charged with murder and after the defendant had been advised of his *Miranda* rights and invoked his right to remain silent during interrogation by the police, did not constitute a custodial interrogation under *Miranda*; and therefore, the defendant's assertion of the right to remain silent did not apply to incriminating statements he made during these conversations. *Halm v. State*, 958 So. 2d 392 (Fla. 2d DCA 2007).

Lastly, the State points out that there are two constitutional bases for the requirement that a confession must be voluntary in order to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment.

The State argues that the Defendant's due process rights were not violated in that the Defendant's will was not overborn by the circumstances surrounding the giving of the confession. A due process test for evaluating the voluntariness of a confession takes into consideration the totality of all surrounding circumstances, both the characteristics of the accused and the details of the interrogation.

In this case the Defendant was placed into a cell with another inmate who recorded the conversation. The deposition of the inmate indicates that the Defendant was not threatened, coerced, or intimidated into making the statements to inmate Grier.

14

> Based on the foregoing, [ ] Defendant's Motion to Suppress Statements, Admissions, and Confessions is hereby denied.

In his motion to suppress, Finch alleged that, on July 18, 2017, police arrested him for murder pursuant to a warrant. (Doc. 9-1 at 62). He alleged that, right after his arrest, detectives interrogated him about the murder and another related murder. (Doc. 9-1 at 62–63). He alleged that, even though he repeatedly informed the detectives that he wanted to leave, the detectives continued to interrogate him. (Doc. 9-1 at 63–64). He alleged that, after several more hours of interrogation, the detectives took him to jail. (Doc. 9-1 at 64). He alleged that the detectives arranged for him to share a cell with an informant who worked for the detectives and that the detectives directed the informant to obtain incriminating statements from him about the murder. (Doc. 9-1 at 64).

During a deposition, the informant testified that Finch arrived at his cell on the evening of his arrest and moved out of his cell the following morning after a hearing in court. (Doc. 9-1 at 219–20). The informant testified that Finch made the incriminating statements on the evening of his arrest. (Doc. 9-1 at 220–21).

In his federal petition, Finch asserts that the detectives violated his federal right against self-incrimination by continuing to interrogate him after

15

he invoked his right to silence and by employing the informant to obtain incriminating statements after he invoked his right to silence. (Doc. 1 at 6–10). He asserts that the detectives violated his federal right to counsel by employing the informant to obtain the incriminating statements without providing him counsel. (Doc. 1 at 10). Lastly, he asserts that the detectives violated his federal right to due process by engaging in deceptive and manipulative tactics to obtain his incriminating statements. (Doc. 1 at 10–12).

**Federal Right against Self-Incrimination**

**Interrogation Room**

Finch asserts that the detectives violated his right against self-incrimination in the interrogation room by continuing to interrogate him after he invoked his right to silence. (Doc. 1 at 6–9).

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966), prohibits a prosecutor from "us[ing] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Before interrogation, a detective must warn a defendant that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444.

16

*Miranda*, 384 U.S. at 444–45, explains that a defendant may waive those rights and may revoke his waiver at any time during the interrogation:

> The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.

However, a defendant must unambiguously and unequivocally invoke his right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Owen v. Fla. Dep't Corrs.*, 686 F.3d 1181, 1192–93 (11th Cir. 2012). "The inquiry as to whether a suspect's invocation of his right to remain silent was ambiguous or equivocal is an objective one." *Medina v. Singletary*, 59 F.3d 1095, 1101 (11th Cir. 1995) (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)). "'A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent.'" *Medina*, 59 F.3d at 1101 (citation omitted).

17

"'[A]n accused's *post-request* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself.'" *Medina*, 59 F.3d at 1101 (quoting *Smith v. Illinois*, 469 U.S. 91, 100 (1984)) (italics in original). "[H]owever, [ ] 'an accused's request . . . may be characterized as ambiguous or equivocal as a result of events preceding the request or of nuances inherent in the request itself.'" *Medina*, 59 F.3d at 1101 (quoting *Smith*, 469 U.S. at 100).

On July 18, 2017, at 1:45 P.M., police arrested Finch pursuant to a warrant for murder and brought him to the police station. (Doc. 9-1 at 23–30). That afternoon, a detective interrogated Finch about the murder. The record in this case contains a copy of a video recording of the interrogation.[2]

Before the interrogation, a detective complied with *Miranda* and advised Finch of his rights, and Finch acknowledged and waived those rights. (Video Recording at 14:44–46). Finch does not assert that he unknowingly or involuntarily waived his rights.

---

[2] The relevant record on federal habeas is "the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181. Before ruling on the motion to suppress, the trial judge viewed the recording of the interrogation. (Doc. 9-1 at 173). A judicially noticed docket from the direct appeal demonstrates that the state trial clerk transmitted the recording to the state appellate court. *Finch v. State*, No. 1D18-3993 (Fla. 1st DCA). In his brief on direct appeal, Finch cited and quoted the recording. (Doc. 9-3 at 19–21). Consequently, when reviewing the claim under § 2254(d), this Court viewed and relied on the recording, instead of a partial transcription of the recording by the court reporter at the hearing on the motion to suppress. (*See* Doc. 9-1 at 657–91).

18

Two detectives interrogated Finch about the murder of Hendley. Finch denied that he shot Hendley and claimed that another person named Isaiah shot Hendley because Hendley had learned that Isaiah murdered a person nicknamed "Tiny Man." (*Id.* at 14:46–15:53). After interrogating Finch for an hour about the murder of Hendley, the detectives gave Finch a half-hour break. (*Id.* at 16:02).

After the break, another detective advised Finch of his rights again, and Finch acknowledged and waived those rights. (Video Recording at 16:25–26). Two detectives interrogated Finch about the murder of "Tiny Man," and Finch admitted that he was present when the murder occurred but denied that he committed the murder and stated that Isaiah committed the murder. (*Id.* at 16:26–48). When Finch became upset during the interrogation, the detectives gave him a break. (*Id.* at 16:48–55).

After the second break, Finch told the detectives that, "I want to go, please. I want to lay down . . . I don't got a good feeling. Please." (Video Recording at 16:55). One of the detectives told Finch that he was offering Finch a chance to help himself, advised that "[a]sking to lay down is not helping," and told him to answer the other detective's questions. (*Id.* at 16:55–57). About ten minutes later, after more questions, Finch told the detectives, "I just want to go home . . . I know that I'm not going home . . . This is crazy."

19

(*Id.* at 17:05). Finch added a short time later, "I need to go home," and a detective responded that he could not let Finch go home. (*Id.* at 17:08).

Finch agreed to help the detectives by calling and speaking with Isaiah about the murder and repeated that he was "trying to go home." (Video Recording at 17:16–17). After a forty-five-minute break, the detectives returned, and Finch agreed again to call Isaiah and another person who was present during the murder of Hendley and the murder of "Tiny Man." (*Id.* at 18:01–08). When the detective told Finch that he faced several problems because he was at the park where the murder of "Tiny Man" occurred and because he knew that other persons had planned the murder before he arrived at the park, he responded, "I really want to go to my cell . . . It's all on me . . . I'm fucked!" (*Id.* at 18:06–07). He repeated that he agreed to call Isaiah and the other person who was present during both murders. (*Id.* at 18:07).

Finch called and spoke with the person who was present during both murders, and the person hung up the phone. (Video Recording at 18:10–12). Also, Finch called and spoke with Isaiah, and Isaiah provided no helpful information. (*Id.* at 18:12–18). After the phone calls, Finch told the detective, "Can I please go? I'm tired of being in here . . . I just want to lay down . . . I've been in here for too long. Please don't walk away and be gone for long." (*Id.* at 18:23). After speaking with the detective a few more minutes, Finch told the

20

detective, "Can I please leave? I don't want to stay in here no more." (*Id.* at 18:26–27). The detective gave Finch a ten-minute break, let him use the restroom, handcuffed him, and took him to jail. (*Id.* at 19:05–07).

The post-conviction court's determination that Finch requested to leave and lie down is presumed correct, and Finch fails to rebut that determination with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Because the video recording supports the determination, the post-conviction court did not unreasonably determine a fact. 28 U.S.C. § 2254(d)(2).

Also, the video recording demonstrates that Finch failed to unequivocally invoke his right to silence. Finch knew that he had the right to terminate the interrogation at any time by invoking his right to silence. Before the interrogation about the murder of Hendley, the detective advised him of the right, and he acknowledged and waived the right. Also, before the interrogation about the murder of "Tiny Man," another detective advised him of the right, and he again acknowledged and waived the right.

Also, during the interrogation, Finch did not simply tell the detectives that he wished to terminate the interrogation because he no longer wanted to speak. He instead asked to leave because he wanted to lay down, because he wanted to go home, and because he wanted to go to his cell. When he made

21

these requests to leave, Finch also agreed to assist the detectives by calling persons who had knowledge about the murders because he thought that his assistance would help him go home. No reasonable police officer would objectively interpret these ambiguous and nuanced requests, coupled with an eagerness to assist law enforcement, as an assertion of the right to remain silent. *Thompkins*, 560 U.S. at 382 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his 'right to cut off questioning.'") (citation omitted).

Because Finch fails to demonstrate that "the state court's ruling [ ] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," the claim is meritless. *Richter*, 562 U.S. at 103.

Even if Finch had unequivocally invoked his right to silence, the prosecutor did not introduce into evidence at trial any statement by Finch during the interrogation with the detectives. Consequently, Finch cannot demonstrate that any error substantially and injuriously affected the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### Jail Cell

Finch further asserts that the detectives violated his right against self-incrimination in the jail by employing the informant to obtain incriminating statements after he invoked his right to silence. (Doc. 1 at 10).

*Miranda*, 384 U.S. at 444, defined "custodial interrogation [as] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990), explains that "[c]onversations between suspects and undercover agents do not implicate the concerns underlying *Miranda*" because "[w]hen a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." Consequently, *Perkins*, 496 U.S. at 300, holds that "an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." *See also United States v. Stubbs*, 944 F.2d 828, 831–32 (11th Cir. 1991) ("If the Fifth Amendment is not implicated when the incarcerated person speaks freely to an undercover agent, we see no justification for concluding the result should be different where, as here, the cellmate is not actually an undercover law enforcement agent but instead is—at best—a confidential informant.").

During a deposition, the informant testified that he was an inmate in the county jail, and that the detectives both informed him that Finch was assigned to his cell and was charged with murder and asked him to speak with Finch about the charge. (Doc. 9-1 at 181, 218–19). The informant testified that he recorded a conversation between him, Finch, and other inmates about the murder, while Finch spent the night in his cell. (Doc. 9-1 at 219–21).

Because Finch did not know that the informant worked for the detectives when he made the incriminating statements in jail, the detectives did not violate Finch's right against self-incrimination by employing the informant to elicit and record the statements. Consequently, the post-conviction court did not unreasonably deny the claim. *Bowen v. Sec'y, Fla. Dep't Corrs.*, 92 F.4th 1328, 1336 (11th Cir. 2024) ("[I]n conversations where 'the suspect does not know that he is speaking to a government agent,' there is 'no reason to assume the possibility that the suspect might feel coerced'— which means *Miranda* protections do not apply.") (quoting *Perkins*, 496 U.S. at 299).

*Bowen*, 92 F.4th at 1336, cited *Perkins* and other opinions by the United States Supreme Court to explain that "police actions that lead to a suspect making incriminating statements to a third party are the functional equivalent of interrogation only if they involve some 'psychological ploy' with

24

sufficient coercive elements." In *Bowen*, 92 F.4th at 1331, the defendant, who invoked his right to silence after a detective advised him of his *Miranda* rights, made incriminating statements to a co-defendant when the detective placed the defendant and the co-defendant in the same room. The court of appeals held that the detective did not engage in a "psychological ploy" with coercive elements because the co-defendant acted independently from the detective and because the defendant did not believe that he spoke in the presence of the detective when he incriminated himself. *Bowen*, 92 F.4th at 1336–37.

During a deposition, the informant testified that the detective only mentioned that Finch was charged with murder, did not tell him any details about Finch's case, and asked whether he could elicit statements from Finch about his case. (Doc. 9-1 at 216, 218). He testified that generally a detective who asks him to record statements by another inmate instructs him to not directly ask the inmate about his case and to allow the inmate to first initiate the discussion about the case. (Doc. 9-1 at 250–51). He testified that, when Finch arrived, he asked whether Finch brought any drugs into jail and whether Finch was "straight," or if anything bad had happened to him. (Doc. 9-1 at 220–21). He testified that Finch responded that he was not "straight," and proceeded to freely speak about the murder charge. (Doc. 9-1 at 221). He

25

testified that he asked Finch more questions about the crime because he had heard about the crime and because he knew the victim. (Doc. 9-1 at 221).

The detective did not know whether Finch would incriminate himself while speaking with the informant. The detective did not disclose to the informant details about the crime and did not direct the informant to ask Finch particular questions. Finch freely spoke about the crime, after the informant generally asked if he was "straight." The informant asked Finch additional questions because the informant knew about the crime. The detective did not engage in a "psychological ploy" with "sufficient coercive elements" by employing the informant to record incriminating statements by Finch. *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980) (identifying examples of "psychological ploys" described in *Miranda* as a line-up with a coached witness, a "reverse line-up" with a coached witness who accuses a suspect of a fabricated crime, a statement that minimizes the moral seriousness of an offense, or a statement that casts blame on society or the victim).

Because Finch did not know that the detective asked the informant for help, that the informant had a recording device, or that the detective would hear his recorded statements about the crimes when he made them, the detective's actions were not the functional equivalent of interrogation under *Miranda*. *Innis*, 446 U.S. at 301 ("[T]he term 'interrogation' under *Miranda*

26

refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police."); *Arizona v. Mauro*, 481 U.S. 520, 529–30 (1987) ("Officers do not interrogate a suspect simply by hoping that he will incriminate himself. . . . In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in *Miranda* and *Edwards*: preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment.").

Even if Finch had invoked his right to silence before the detectives arranged for the informant to meet with Finch, Finch fails to identify clearly established law by the Supreme Court of the United States that requires suppression of his statements. Consequently, Finch is not entitled to relief. 28 U.S.C. § 2254(d)(1). *United States v. Kimbrough*, 477 F.3d 144, 150 (4th Cir. 2007) ("We note at the outset that Appellee faces a difficult challenge in advancing this argument. He cites no cases, nor can we locate any, in which statements or confessions elicited through private questioning have been suppressed."); *see Michigan v. Mosley*, 423 U.S. 96, 104 (1975) ("We therefore

27

conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'").

Lastly, even if the detective had violated Finch's right to silence by employing the informant to ask him questions about the crime, other compelling evidence at trial proved Finch's guilt. Two witnesses observed that, during a game of dice, Hendley won money, and Finch lost money. (Doc. 9-2 at 290–93, 340). Shortly after, one witness heard a gunshot, saw Hendley with a gunshot wound on the ground, and saw that Finch had left. (Doc. 9-2 at 293–96, 302–09). The other witness saw Finch bet a firearm, heard a gunshot when Hendley started to leave with money that he won, and saw Finch holding the firearm. (Doc. 9-2 at 343–44). Immediately after the shooting, both witnesses told the sister of Finch's girlfriend, who lived next door, that Finch shot Hendley. (Doc. 9-2 at 399–402).

After his arrest, Finch sent a letter to his girlfriend asking that she dissuade any witness from testifying in a deposition. (Doc. 9-2 at 437–38, 651). During a telephone call in jail, Finch also asked his girlfriend to dissuade witnesses from testifying against him at trial and asked her to refuse to testify as well. (*See* Doc. 9-2 at 592–623). This evidence demonstrated consciousness of guilt. *Special v. West Boca Med. Ctr.*, 160 So. 3d 1251, 1261–62 (Fla. 2014)

28

("Florida courts permit evidence of threats or witness intimidation if the threats are attributable to the opposing party. It is admissible because it is 'evidence of a consciousness of guilt,' and there is nothing more sacred than judicial proceedings that are free from attempts to tamper with or intimidate witnesses.") (citations omitted).

Even without Finch's statements to the informant, other compelling evidence proved Finch's guilt. Consequently, even if the detective had violated Finch's right to silence by employing the informant, Finch cannot demonstrate that any error substantially and injuriously affected the jury's verdict. *Brecht*, 507 U.S. at 637.

**Federal Right to Counsel**

Finch asserts that the detectives violated his right to counsel by employing the informant to obtain the incriminating statements without providing him counsel. (Doc. 1 at 10).

"The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). A prosecution commences after "'the initiation of adversary judicial criminal proceedings— whether by way of formal charge, preliminary hearing, indictment,

29

information, or arraignment.'" *Rothgery*, 554 U.S. at 198 (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).

During a deposition, the informant testified that Finch arrived at his cell on the evening of his arrest and moved out of his cell the following morning after a first appearance hearing in court. (Doc. 9-1 at 219–20, 227). The informant testified that Finch made the incriminating statements on the evening of his arrest. (Doc. 9-1 at 220–21).

Also, on July 18, 2017, police arrested Finch (Doc. 9-1 at 23, 26–27), and on July 19, 2017, a trial judge appointed Finch counsel. (Doc. 9-1 at 34). On August 3, 2017, the prosecutor filed an information charging Finch with second-degree murder and possession of a firearm by a felon. (Doc. 9-1 at 38).

Because Finch made the incriminating statements before the trial judge appointed him counsel and before the prosecutor filed an information, the detectives did not violate his Sixth Amendment right to counsel by employing the informant to elicit the statements without providing counsel. *Kight v. Singletary*, 50 F.3d 1539, 1548 (11th Cir. 1995). Also, because Finch did not request an attorney before or during the interrogation, his right to counsel under *Miranda* did not attach, either. *Gore v. Sec'y, Dep't Corrs.*, 492 F.3d 1273, 1299–1300 (11th Cir. 2007) ("Absent a request for counsel—an

30

indication to the police that the suspect wishes to interact with them through counsel alone—the Fifth Amendment right does not attach.").

**Federal Right to Due Process**

Finch asserts that the detectives violated his federal right to due process by engaging in deceptive and manipulative tactics to obtain his incriminating statements. (Doc. 1 at 10–12).

"[C]ertain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). "Faced with statements extracted by beatings and other forms of physical and psychological torture, the Court held that confessions procured by means 'revolting to the sense of justice' could not be used to secure a conviction." *Miller*, 474 U.S. at 109 (quoting *Brown v. Mississippi*, 297 U.S. 278, 286 (1936)). "[T]actics for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness." *Miller*, 474 U.S. at 110.

"Convictions based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003)

(quoting *Rochin v. California*, 342 U.S. 165, 172, 174 (1952)). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense[.]'" *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation omitted). "In reviewing charges that official conduct rose to a constitutionally impermissible level, the cases turn on the totality of the circumstances without any single controlling factor." *Owen v. Wainwright*, 806 F.2d 1519, 1521 (11th Cir. 1986) (citations omitted).

Finch fails to cite clearly established law as determined by the United States Supreme Court that holds that the use of an informant to elicit incriminating statements violates a suspect's federal right to due process. 28 U.S.C. § 2254(d)(1); *see, e.g.*, *United States v. Russell*, 411 U.S. 423, 431–32 (1973) ("While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed.") (citation omitted).

The detective recruited the informant to speak with Finch about the murder and provided him a recorder to record the conversation. (Doc. 9-1 at 215–16). The detective carefully did not disclose the details of the crime and did not direct the informant to ask any particular question. (Doc. 9-1 at 219).

32

The informant knew to not initially ask an inmate about a crime and to instead wait until the inmate first spoke about the crime. (Doc. 9-1 at 250–51). When the informant asked Finch if he was "straight," Finch responded by freely speaking about the crime. (Doc. 9-1 at 220–21). The informant asked Finch further about the crime because the informant had heard about the crime. (Doc. 9-1 at 221–22). The informant pleaded guilty to his charged crimes, the prosecutor waived any mandatory minimum sentence for the crimes, and the informant faced thirty years in prison at sentencing. (Doc. 9-1 at 237). The informant hoped that he would receive a sentence that was less than thirty years in prison because of his assistance to law enforcement. (Doc. 9-1 at 238).

The totality of these circumstances does not demonstrate that the detective employed investigative methods "'so offensive to human dignity' that they 'shoc[k] the conscience.'" *Chavez*, 538 U.S. at 774. Consequently, the state court did not unreasonably deny the federal due process claim. *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1307 (11th Cir. 2003) ("A government interest is advanced by using confidential informants. . . . Some confidential informants have blemishes on their own records which make them more acceptable to the criminal element on which they are to inform.

33

The government cannot be expected to rely exclusively upon the virtuous in enforcing the law.").

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1.    The Petition (Doc. 1) is **DENIED** and this action is **DISMISSED WITH PREJUDICE**.

2.    The Clerk of the Court shall enter judgment dismissing this action with prejudice, terminate any pending motions, and close the file.

3.    If Petitioner appeals this Order, the Court denies a certificate of appealability.[3] Because the Court has determined that a certificate of appealability is not warranted, the Clerk of the Court shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

---

[3] The court should issue a certificate of appealability only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" *Miller–El v. Cockrell,* 537 U.S. 322, 335–36 (2003) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n.4 (1983)). Upon due consideration of the record as a whole, this Court denies a certificate of appealability.

**DONE AND ORDERED** at Jacksonville, Florida on March 23, 2026.

JORDAN E. PRATT
UNITED STATES DISTRICT JUDGE

Copies:
*Pro Se* Defendant
Counsel of Record